**UNITED STATES of America, Appellee,**

v.

**James BURKE, Anthony Perla, Rocco Perla, and Richard Kuhn, Defendants-Appellants.**

Nos. 26, 27, 28, 29, Dockets 82–1028, 82–1030, 82–1032, 82–1056.

United States Court of Appeals, Second Circuit.

Argued Sept. 20, 1982.

Decided Jan. 28, 1983.

Gerald L. Shargel, New York City, for defendant-appellant Burke.

James K. O'Malley, Pittsburgh, Pa., for defendants-appellants Rocco and Anthony Perla.

Gary B. Zimmerman, Pittsburgh, Pa., for defendant-appellant Kuhn.

Edward A. McDonald, Attorney-in-Charge, U.S. Dept. of Justice, Organized Crime Strike Force, E.D.N.Y., Brooklyn, N.Y. (Edward R. Korman, U.S. Atty., E.D. N.Y., Lawrence H. Sharf, Sp. Counsel, E.D. N.Y., Brooklyn, N.Y., of counsel), for appellee U.S.A.

James C. Goodale, John G. Koeltl, Gary W. Kubek, Debevoise & Plimpton, New York City, for amicus curiae Time, Inc.

Before LUMBARD, MESKILL and CARDAMONE, Circuit Judges.

MESKILL, Circuit Judge:

The defendants appeal from the judgment of the United States District Court for the Eastern District of New York, Bramwell, *J.*, convicting them, after a four week jury trial, on charges of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (1976 & Supp. V 1981) (RICO), conspiracy to commit sports bribery, 18 U.S.C. § 224 (1976), and interstate travel with the intent to commit bribery, 18 U.S.C. § 1952 (1976). They challenge several rulings made by the trial court and ask this Court to reverse their convictions.

The judgment of the district court is affirmed.

*Background*

The appellants' convictions arise from their participation in the Boston College (B.C.) basketball "point shaving scandal." [1] The evidence presented at trial, although somewhat sketchy, revealed that the point shaving scheme was born in Pittsburgh during the summer months of 1978 and was the brainchild of Rocco Perla and his brother Anthony (Tony). The Perla brothers were small-time gamblers with big-time ideas who viewed the 1978–79 B.C. basketball season as a perfect opportunity to implement these ideas. Their optimism was fueled by the prospect that they might recruit Richard Kuhn to join the scheme. Kuhn, a high school friend of Rocco Perla, was entering his senior year at B.C. and was expected to be a key member of the 1978–79 B.C. basketball team.

The Perlas proposed a simple scheme. They would select, in concert with Kuhn, certain basketball games where the projected point spread separating B.C. from its

---

1. This scandal reached national prominence when Sports Illustrated (SI), in its February 16, 1981 issue, published an article by Henry Hill, in collaboration with Douglas Looney, entitled *How I Put The Fix In.* This article purported to be Henry Hill's first-hand account of the point shaving scheme and implicated the appellants in this scandal.

opponent was expected to be significant.[2] Kuhn would be responsible for ensuring, by his play on the court, that B.C. fell short of the point spread. Thus, for example, if participating bookmakers determined B.C. to be an eight-point favorite in a particular game, Kuhn would be paid his bonus, usually $2,500, if B.C. won by less than eight points. Kuhn agreed to participate in this scheme.

Rocco and his brother Tony then mobilized a betting syndicate to maximize their potential gain from this illegal operation. They contacted a local friend, Paul Mazzei, who was known to have influence within major New York gambling circles. Mazzei in turn contacted Henry Hill, a reputed underworld figure from New York who had befriended Mazzei while both men were serving sentences in a federal penitentiary. Mazzei and the Perlas were particularly hopeful that Hill would enlist the support of his reputed underworld "Boss," defendant James Burke, to ensure protection for their enterprise in the event that the bookmakers discovered they were being swindled. Hill and Burke were brought into the scheme.

On November 16, 1978, Burke instructed Hill, Mazzei and Tony Perla to meet in Boston with Kuhn and any other member of the B.C. team interested in participating in their scheme. Hill, Mazzei and Tony Perla flew to Logan Airport in Boston and, after discussing their strategy with Kuhn, the defendants agreed that the upcoming Providence game would be an appropriate test for their scheme. Hill then paid Kuhn several hundred dollars good-faith money and Mazzei furnished him with some cocaine to seal the conspiracy.

The Providence game was played on December 6, 1978 and Boston College was favored to win by six to seven points. Kuhn was thus expected to keep the score below the six to seven point margin. The test run for the scheme proved unsuccessful, however, when B.C. established an early lead and ultimately won the game by nineteen points. Apparently enraged by their gambling loss, the appellants decided to recruit additional B.C. players to enhance their control over the outcome of the games. They approached Ernie Cobb, the leading scorer on the team, and Joseph Beaulieu, who shared the center position with Kuhn. Cobb agreed to cooperate, while Beaulieu rejected this offer.

The December 16 Harvard game was chosen as the second test for the scheme. B.C. was favored by twelve points, but won the game by only a three-point margin, 86 to 83. The bettors were very happy with this result and Kuhn was paid $2,500 for his efforts. The scheme continued to work successfully in the December 23 U.C.L.A. game,[3] where U.C.L.A., a fifteen to eighteen point favorite, won the game by twenty-two points.

Suspecting that some bookmakers might be getting wise to the scheme, the defendants temporarily revised their strategy after the U.C.L.A. game. To allay any suspicions of foul play, the defendants decided to bet on B.C. to win by *more* than the point spread in a game that they were confident B.C. would win handily. The conspirators chose the January 17 University of Con-

**2.** Much of the defendants' trial was devoted to an explanation of the practical operation and nuances of professional gambling. Fundamentally, the process begins when participating bookmakers agree to establish a "line" on an upcoming sporting event. Bookmakers create this "line" by determining, on the basis of prior records, injuries, home field advantage and other pertinent factors, which team should be favored to win the upcoming game. The bookmaker then must establish the so-called "point spread." If the teams are fairly even in the competitive sense, the point spread will be low. Thus, for example, if teams A and B are rela-

tively equal, the better team generally would be favored to win by a small margin, perhaps 1–3 points. Conversely, if one team is far superior, the point spread would be much larger. To prevail, the gambler must pick the team that will beat the point spread. Hence, if Team A is favored by 5 points, the gambler who bets on that team wins if it beats Team B by more than five points. The bettor who wagers money on Team B will win if that team wins the game or even if it loses by less than 5 points.

**3.** The U.C.L.A. game was the first game that the players agreed to lose intentionally.

necticut (UCONN) game to implement this plan. Their strategy was effective; B.C., a two to three point favorite, beat UCONN by a margin greater than the point spread.[4]

In early February, B.C. was scheduled to play two New York teams, Fordham and St. John's. The defendants decided that these games presented especially good opportunities because New York bookmakers generally accepted large bets for New York teams. They reintroduced the original strategy and it proved successful for the February 3 Fordham game when B.C., a thirteen point favorite, won by seven points. The February 6 St. John's game was a "push:" the bettors neither won nor lost when St. John's prevailed by the exact betting margin established by participating bookmakers.

Confident from their recent success, the defendants viewed the February 10 Holy Cross game as an opportunity to reap the full benefits of their scheme. They were aware that bookmakers generally accepted large bets on this game because B.C. and Holy Cross were traditional rivals and also because the game was being televised nationwide. Holy Cross was favored to win and, consistent with the scheme, the defendants bet on Holy Cross to win by a margin greater than the point spread. Holy Cross ultimately won by only two points, however, and the defendants lost a substantial amount of money. The scheme thus concluded on an unsuccessful note.

The criminal conspiracy unraveled when Henry Hill was indicted by state authorities on drug conspiracy charges and subsequently was implicated in the Lufthansa robbery at Kennedy Airport in New York.[5] While being questioned on these charges, Hill revealed that he had recently participated in a point shaving scheme involving the B.C. basketball team and various underworld figures. Hill offered to relate the full story of the swindle if federal officials would guarantee him full immunity and would agree to intercede on his behalf to convince state officials to drop the drug charges pending in state court. The grand jury indicted Burke, Mazzei, Kuhn, Rocco Perla and Tony Perla on the basis of testimony given by Hill. Hill was indicted as a co-conspirator, but was not named as a defendant.

At trial, the government's case consisted principally of the testimony of Henry Hill and three other witnesses, James Sweeney and Joseph Beaulieu, both B.C. players, and Barbara Reed, a 23-year-old nurse who lived with Kuhn during the 1978–79 B.C. season. The government also introduced two confessions, one made by Kuhn and the other by Tony Perla. Finally, the government presented telephone records showing evidence of extensive communications between the conspirators during the 1978–79 season, and records provided by Western Union and various hotels which further corroborated government testimony.

Each appellant was convicted, after a four week jury trial, on charges of RICO conspiracy, 18 U.S.C. § 1962(d) (1976 & Supp. V 1981), conspiracy to commit sports bribery, 18 U.S.C. § 224 (1976), and interstate travel with the intent to commit bribery, 18 U.S.C. § 1952 (1976). Judge Bramwell sentenced defendant Burke to a twenty year prison term. Appellants Kuhn, Mazzei and Tony Perla were sentenced to ten year prison terms on the RICO count, and concurrent five year terms on the two

---

4. The trial testimony relating to the UCONN game highlights the inconsistencies between Henry Hill's testimony at trial and his representations in the SI article. Hill maintained at trial that the game was played on January 17, that B.C. was favored by two or three points and that B.C. ultimately won by a margin greater than the point spread. The SI article indicates that the game was played on January 27, that B.C. was a five to six point favorite and that B.C. won the game by one point, 78–77. We are, however, bound by the evidence presented at trial and our discussion of the facts reflects this limitation.

5. On Friday, December 8, 1978, one of the largest armed robberies in United States history occurred at the Lufthansa cargo warehouse in Kennedy Airport. The criminals involved in that robbery absconded with $5 million in cash and $1 million in jewelry. *See generally United States v. Werner,* 620 F.2d 922, 924–27 (2d Cir. 1980).

remaining counts. The court imposed a four year jail term on Rocco Perla. *See* 18 U.S.C. § 1963 (1976).[6]

Appellant Mazzei decided to pursue his appeal separate from his co-defendants. *See United States v. Mazzei*, 700 F.2d 85, Docket No. 82–1146 (2d Cir. Jan. 28, 1983).

*Discussion*

The appellants point to eight rulings made by the trial court to support their claims of judicial error. Only two of these rulings merit extended discussion. We will deal with the other claims briefly.

### A. *Propriety of Quashing Subpoena*

On February 16, 1981, Sports Illustrated (SI) published an article written by Henry Hill, in collaboration with Douglas Looney, entitled *How I Put The Fix In*. This article purported to be Hill's first-hand account of the point shaving scheme. Prior to trial, counsel for appellant Burke served a subpoena on Time, Incorporated,[7] the parent company of SI, seeking production of virtually every document and tape in the possession of SI that in any way related to the Looney article.

Time, Inc. moved to quash the subpoena pursuant to Fed.R.Crim.P. 17(c), relying on the First Amendment reporter's privilege and arguing that broad-ranging production of SI documents would be unreasonable and unnecessary. Judge Bramwell ordered the subpoena quashed prior to trial, but permitted the appellant leave to renew his request after Henry Hill had testified. The court explained that the decision whether to grant or deny disclosure of SI documents relating to the Looney article could be made more intelligently after Hill had testified to

his recollections of the point shaving scheme.

Burke renewed the subpoena request after Hill had concluded his testimony. Time, Inc. again moved to quash. Judge Bramwell granted the Rule 17(c) motion again, explaining that Burke had not satisfied his burden of showing that the subpoenaed documents were highly material and necessary to his case and not obtainable from other sources. The court noted that the only important evidentiary purpose served by production of these documents, *i.e.,* impeaching the credibility of Henry Hill, did not defeat Looney's First Amendment privilege. Hill had been thoroughly impeached at trial and thus the SI materials, even if relevant, would serve a solely cumulative purpose. Judge Bramwell did order Looney to testify at trial, and he testified over the objection of Time, Inc., to any inconsistencies between Hill's in-court testimony and what he told Looney while preparing the SI article.

On appeal, Burke contends that Hill's testimony was the *sine qua non* of the government's case against him. He asserts that the court committed reversible error when it refused to review the SI documents *in camera* to determine if they would have substantially contradicted Hill's testimony and thus enhanced his chances for acquittal. When a litigant seeks to subpoena documents that have been prepared by a reporter in connection with a news story, this Circuit's standard of review, at least in civil cases, is well settled:

> The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclo-

**6.** 18 U.S.C. § 1963 provides in part:
§ 1963. Criminal penalties
(a) Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influ-

ence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

**7.** Sports Illustrated is a subsidiary of Time, Inc. Burke also served subpoenas on reporter Looney and the Managing Editor of Sports Illustrated. For convenience, we refer to these entities collectively as "Time, Inc." Counsel for Time, Inc. submitted a brief as amicus curiae.

sure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources. *Baker v. F & F Investment,* 470 F.2d 778, 783–85 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973). *Accord, Zerilli v. Smith,* 656 F.2d 705, 713–15 (D.C.Cir. 1981); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 438 (10th Cir.1977). *In re Petroleum Products Antitrust Litigation,* 680 F.2d 5, 7–8 (2d Cir.1982) (per curiam). This demanding burden has been imposed by the courts to "reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment, *see, e.g., New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)." *Baker v. F & F Investment,* 470 F.2d 778, 782 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).

■ We see no legally-principled reason for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality should yield to the moving party's need for probative evidence. To be sure, a criminal defendant has more at stake than a civil litigant and the evidentiary needs of a criminal defendant may weigh more heavily in the balance. Nevertheless, the standard of review should remain the same. Indeed, the important social interests in the free flow of information that are protected by the reporter's qualified privilege are particularly compelling in criminal cases. Reporters are to be encouraged to investigate and expose, free from unnecessary government intrusion, evidence of criminal wrongdoing.

This Circuit has recognized, albeit implicitly, that the reporter's qualified privilege extends to both civil and criminal cases. In

*United States v. Orsini,* we affirmed the district court's finding that:

> [T]here exists no absolute rule of privilege protecting newsmen from disclosure of confidential sources. Instead, what is required is a case by case evaluation and balancing of the legitimate competing interests of the newsman's claim to First Amendment protection from forced disclosure of his confidential sources, as against the defendant's claim to a fair trial which is guaranteed by the Sixth Amendment.

424 F.Supp. 229, 232 (E.D.N.Y.1976), *aff'd mem.,* 559 F.2d 1206 (2d Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 636, 54 L.Ed.2d 491 (1977). This view has been adopted by courts in other jurisdictions. *See, e.g., United States v. Cuthbertson,* 630 F.2d 139, 146–47 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *United States v. Hubbard,* 493 F.Supp. 202, 205 (D.D.C.1979); *see also Baker v. F & F Investment,* 470 F.2d at 784–85 (this Court observed that the Supreme Court's decision in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), recognized the need to balance First Amendment values even where a reporter is asked to testify before a grand jury). Having resolved this threshold issue, we proceed to balance the First Amendment interests of reporter Looney against the evidentiary needs of defendant Burke.

■ The *Petroleum Products* test requires the moving party to make a clear and specific showing that the subpoenaed documents are "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." 680 F.2d at 7. The Looney work papers may have been material and relevant inasmuch as they might have contradicted the trial testimony of Henry Hill. However, the appellant has completely failed to make the clear and specific showing that these documents were necessary or critical to the maintenance of his defense.[8]

8. The appellant has also failed to satisfy the third prong of the *Petroleum Products* test, *i.e.,* a clear and specific showing that the materials could not be obtained from another source.

■ Counsel for Burke admitted at trial that the principal evidentiary purpose served by the Looney materials would be to impeach the credibility of Henry Hill. Judge Bramwell observed, however, that Hill had been impeached thoroughly during trial and thus any further impeachment evidence introduced against him would serve a solely cumulative purpose. The trial record fully supports the finding of the court that Hill's credibility was effectively attacked without resort to the SI documents. Specifically, Hill conceded that he was a career criminal who had committed many heinous crimes, including armed robbery, arson and hijacking. The witness admitted during direct examination that he had been convicted for his involvement in an extortion ring, and for loansharking, trafficking in heroin, cocaine and other illicit drugs. After counsel had exposed this litany of abuses, Judge Bramwell was prompted to remark:

> Now, with what's come out as to this witness, I see—I mean—it couldn't be worse as far as what would show as to a man in his condition.
>
> I mean he's done everything, every type of crime and situation.

Brief for Appellee at 26.

In addition to this wealth of impeachment evidence, Judge Bramwell also ordered that a redacted version of Hill's immunity agreement be read to the jury. Thus, the jury was aware that Hill, in an effort to curry favor with the government and thereby seal his immunity, might be expected, regardless of his actual beliefs, to testify favorably for the prosecution. Finally, the court required Looney to testify at trial and defense counsel was able to expose inconsistencies between Hill's trial testimony and his representations to Looney. In light of this extensive impeachment evidence, the district court properly concluded that any information to be gleaned from the SI work papers would be merely cumulative and thus would not defeat Looney's First Amendment privilege.[9]

### B. Instruction on Partial Verdict

While the jury was deliberating, it submitted the following note to Judge Bramwell:

> Do we have to reach a verdict for all five defendants; that is, can some be guilty of one or more counts, and the others be undecided?

Brief for Appellant Burke at 44. The court responded:

> Well, it's the desire of the Court and of all parties that if possible you return veridct [sic] on all five defendants if you can do so without violating your individual conscience.

*Id.*

The appellants argue that there is but one reasonable interpretation of this inquiry, namely, that the jury was considering the possibility of rendering a partial verdict and was unsure whether it was permitted to return such a verdict during the course of its deliberations. The appellants further contend that the district judge committed reversible error when he failed to

---

Attorney Robert Simels acted as counsel to Hill and was present during each interview between Hill and Looney, yet Burke has not moved to subpoena Simels' work papers or to compel Simels to testify to his recollections. The appellant offers the lame excuse that Simels will merely claim attorney-client privilege. Of course, no privilege could have been asserted regarding Hill's conversations with Looney overheard by Simels. In any event, this "prediction" does not insulate defense counsel from his duty to exhaust all reasonable alternatives. *Petroleum Products* demands that effort. *See* 680 F.2d at 8–9; *United States v. Cuthbertson,* 651 F.2d 189, 196 (3d Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981).

9. Our holding should not, however, be read as an indictment or criticism of *in camera* review. We encourage the courts to inspect potentially sensitive documents, especially in situations where, as here, the record reveals that the SI work papers were not sufficiently voluminous to render *in camera* review impracticable. We would have been troubled by the court's failure to undertake *in camera* review if there were any reasonable grounds to believe that inspection of the SI work papers would yield any probative evidence, other than cumulative impeachment evidence, to support the appellant's case. No such showing was made here.

instruct the jury under Fed.R.Crim.P. 31(b) that it could return a partial verdict at any time and reserve judgment on any remaining defendants or counts. Finally, the appellants maintain that their convictions should be reversed because the court's response to the jury inquiry was unduly coercive.

The appellants rely principally on this Court's decision in *United States v. DiLapi*, 651 F.2d 140 (2d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982), to support their Rule 31(b) claim. In *DiLapi*, the jury reported during deliberations that it had reached verdicts on some of the defendants, but did not express at that time a preference for reporting a partial verdict. Defense counsel asked the court to give a Rule 31(b) instruction, but this request was denied. The defendant objected to the court's ruling, arguing that the judge committed reversible error under Rule 31(b) when he failed to instruct the jury of its right to render a partial verdict.

On appeal, we reviewed the important function that the jury serves in the American criminal justice system. We then focused on the unique problems that juries confront in multiple defendant trials, particularly in fulfilling their constitutional duty to ensure that the evidence against each defendant be given separate and individual consideration. *See id.* at 146–47; *United States v. Calabro*, 449 F.2d 885, 893 (2d Cir.1971), *cert. denied*, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972). We explained that juries must be afforded "considerable latitude in determining for themselves the structure of the deliberative process that will best assure individual consideration of each defendant," including full discretion to decide when to report its verdict. *United States v. DiLapi*, 651 F.2d at 146. We cautioned, however, that since unrestricted jury discretion poses a serious threat to the integrity of the judicial system, it is incumbent on the district judge to ensure that such discretion be exercised intelligently. Consistent with this duty to "inform," the district judge would be expected to give a Rule 31(b) instruction under appropriate circumstances:

We think that juries should be neither encouraged nor discouraged to return a partial verdict, but should understand their options, especially when they have reached a stage in their deliberations at which they may well wish to report a partial verdict as to some counts or some defendants. In this case, the jury reported that it had reached a decision as to four of the defendants, was divided on the remaining two defendants, and awaited further instructions. At that point, particularly in view of counsel's request, an appropriate response from the trial judge should have included a neutral explanation of the jury's options either to report the verdicts reached, or to defer reporting of all verdicts until the conclusion of deliberations.

*Id.* at 147.

Upon concluding our review of the difficult procedural issues raised in multiple defendant trials, we ruled that the district judge's failure to give an instruction on partial verdicts did not violate Rule 31(b):

Plainly Rule 31(b) would be violated if a trial judge were to tell a jury it may not return a partial verdict or were to refuse a jury's request to return a partial verdict. But that is not what occurred here. Though the jury reported that it had reached verdicts as to some of the defendants, it did not indicate any preference for reporting a partial verdict. The request for return of a partial verdict came from counsel, and it was that request that Judge Bramwell refused.

. . . .

. . . However, the absence of such an explanation [on partial verdicts] did not deny the appellants any protected right in a case such as this where the jury neither attempted to return a partial verdict nor even asked if it could do so.

*Id.* at 146–47.

■ In this appeal, there are three plausible interpretations of the disputed jury request. The jury might have been inquiring whether it would ultimately be required to reach a verdict as to each defendant.

The request for instruction may have been intended as a preliminary inquiry to determine the various options available to the jury during deliberations. Finally, the question may have been a reflection of the jury's wish to render a partial verdict. We do not propose to second-guess the trial court in difficult situations where, as here, the request for instruction is ambiguous. The district judge is able to observe first hand the tenor of the trial and is best suited to make informed judgments upon requests for instruction. We will not overturn those judgments under Rule 31(b) or *DiLapi* except upon a specific showing that the court refused to accept a partial verdict or specifically instructed the jury that it would not be permitted to return a partial verdict.

■ The *DiLapi* case presented a much closer question of reversible error under Rule 31(b). In *DiLapi*, the jury sent a note to the judge stating: "We have reached a verdict on four of the defendants. We are sharply and evenly split on the remaining two. We await further instruction from the Court." *Id.* at 144. Counsel then requested that the jury be given a Rule 31(b) instruction, but the judge refused. On the next day, the jury sent another note to the judge: "We have reached a unanimous decision on seven counts, but remain hopelessly deadlocked on the remaining five counts." *Id.* at 145. Counsel again suggested that the jury be given a Rule 31(b) instruction, and the court rejected this request despite the clear possibility that the jury might have desired to render a partial verdict at that time.

In *DiLapi*, we questioned the district judge's failure to give a Rule 31(b) instruction under these circumstances, but nonetheless held that "the absence of such an explanation did not deny the appellants any protected right." *Id.* at 147. This conclusion applies with equal force to the present dispute. Rule 31(b) requires only that the district judge accept a partial verdict upon request, and refrain from instructing the jury that they may not return a partial verdict.

■ We also find that the appellants were not prejudiced, nor was the jury coerced by the court's instruction. *See generally United States v. Robinson*, 560 F.2d 507, 517 (2d Cir.1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *United States .v. Rao*, 394 F.2d 354, 355 (2d Cir.), *cert. denied*, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968). Judge Bramwell's response to the jury's request for instruction was evenhanded and did not "tend[ ] to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." *United States v. Robinson*, 560 F.2d at 517, *citing United States v. Green*, 523 F.2d 229, 236 (2d Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). We have recognized that the district court may instruct the jury in an evenhanded, noncoercive manner that it would prefer a unanimous verdict if accomplished "without any juror yielding a conscientious conviction which he or she may have." *United States v. Rao*, 394 F.2d at 355; *see United States v. Barash*, 412 F.2d 26, 32 (2d Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969). This charge, first recognized by the Supreme Court in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), remains valid in our Circuit. *See United States v. Robinson*, 560 F.2d at 517.

Finally, the length of time between the court's instruction and the actual rendering of the jury verdict is probative of the fact that the jury was not coerced or unduly influenced by the judge's remarks. The request for instruction occurred shortly after 12:00 noon on Saturday and the jury submitted additional requests and continued to deliberate until 6:25 p.m. When deliberations resumed on Monday, the jury submitted several other requests for instruction and did not reach a verdict until 5:20 p.m. on that day. This substantial interval between Judge Bramwell's remark and the rendering of the verdict indicates that the jury freely exercised its decision-making authority and was not unduly influenced by the court's instruction. *See United States v. O'Connor*, 580 F.2d 38, 44 (2d

Cir.1978) (Court permits two modified *Allen* charges, "especially since the jury, which had reported that it was hung, continued to deliberate for several hours after the second charge was given."); *United States v. Robinson,* 560 F.2d at 517.

## C. *Rule 30 Claim*

■ During the course of trial, the government called Christine Siano to testify to the substance of a conversation between herself and her neighbor, Tony Perla. She testified that Perla, when asked about the SI article implicating him in the B.C. scandal, had remarked: "[S]o I shaved a few games, it is no big deal, and they're not going to put me away for this." At the close of trial, the government submitted a request to charge asking the court to instruct the jury that the Perla statement constituted an admission. Judge Bramwell read this request during his charge conference and then inquired whether the defendants objected to the government's proposal. The following colloquy occurred at that point:

Mr. Zimmerman (counsel for Kuhn): I object to that.

The Court: That is request number 13.

Mr. Zimmerman: I object to the wording.

The Court: What do you say?

Mr. McDonald (the prosecutor): My objection is that you did not include Anthony Perla in there. The statement which he made to Christine Cianna [sic].

The Court: Just a moment. I'm going to leave that out.

Counsel for appellant Tony Perla argues on appeal that he interpreted Judge Bramwell's remark to mean that the court would not instruct the jury that Perla's statement to Siano constituted an admission. He asserts that his closing arguments were prepared with the expectation that Perla's statement to Siano would not be included in the court's instruction. Perla contends that Judge Bramwell committed reversible error under Fed.R.Crim.P. 30 when he later revised the jury instruction to include the Perla admission after closing arguments had been completed.

Counsel's arguments are not persuasive because Perla's statement clearly constituted an admission. Given that fact, it is readily apparent that Judge Bramwell's remark at the charge conference, albeit somewhat unclear, referred not to his decision to forego an instruction on Perla's admission, but rather reflected his decision not to use the government's proposed instruction. If counsel did not fully understand this remark, he should have asked for clarification because he could not have reasonably expected that the court would gloss over this important testimony. Indeed, when counsel for Perla objected to the admissibility of the Siano testimony earlier in the trial, the court specifically stated that Perla's inculpatory statement "[c]omes in as an admission."

## D. *Failure to Instruct the Jury on a Theory of the Case*

Appellants Kuhn, Rocco Perla and Tony Perla argue that their complicity, if any, in the point shaving scheme was limited to buying and selling inside information on B.C. games, but did not extend to "point shaving" as the government had alleged. They argue that the "inside information" theory constituted a legally sufficient defense to the government's RICO charges and assert that the district judge committed reversible error under Fed.R.Crim.P. 30 when he failed to instruct the jury on this theory.

■ Every criminal defendant is entitled to have his theory of the case, if it could amount to a legally sufficient defense based upon the evidence presented at trial, fairly submitted to the jury. Fed.R.Crim.P. 30. The request to charge under Rule 30 must identify, with some reasonable degree of clarity, the theory of the case desired by the defendant. *See United States v. Grammatikos,* 633 F.2d 1013, 1022 (2d Cir.1980) (defenses must be "squarely interposed").

■ In this action, the appellants did not request that the jury be instructed on their "inside information" theory. They did

not object to the court's failure to give that specific charge. "In the absence of clear error by the trial court in its instructions, failure to make timely request for, or objection to, instructions to the jury waives all objections to the charge given. Fed.R. Crim.P. 30." *United States v. Bermudez,* 526 F.2d 89 at 97 (2d Cir.); *see also United States v. Grammatikos,* 633 F.2d at 1022; *United States v. Barash,* 412 F.2d 26, 33 (2d Cir.), *cert. denied,* 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969).

The court's failure to instruct on the "inside information" theory was not clear error. Defense counsel never even hinted at trial that the appellants had paid or received money for providing inside information on B.C. basketball games. The court properly limited its instruction to those defenses that could be fairly gleaned from the evidence. No error is shown here.

### F. *Denial of Hearing on Preindictment Publicity*

■ The appellants maintain that their right to a fair, impartial trial was jeopardized due to the widespread, adverse publicity generated by the SI exposé of the B.C. conspiracy. They argue that the district judge committed reversible error when he denied their request for a preindictment hearing to determine whether the grand jury could give fair and impartial consideration to their case.

When a person is brought before the grand jury and charged with a criminal offense, that individual is constitutionally entitled to have his case considered by an impartial and unbiased grand jury. *See Lawn v. United States,* 355 U.S. 339, 349–50, 78 S.Ct. 311, 317–318, 2 L.Ed.2d 321 (1958); *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). The grand jury need not deliberate in a sterile chamber, however, to satisfy this constitutional guarantee, *see United States v. Nunan,* 236 F.2d 576, 593 (2d Cir. 1956), *cert. denied,* 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); *United States v. Myers,* 510 F.Supp. 323, 325 (E.D.N.Y.1980), and a criminal conviction appealed on grounds of adverse preindictment publicity will not be overturned unless the moving party can "bear the heavy burden of demonstrating that he has suffered actual prejudice as a result of the publicity." *United States v. Myers,* 510 F.Supp. at 325–26; *see United States v. Mandel,* 415 F.Supp. 1033, 1061–65 (D.Md.1976), *aff'd in part, vacated and remanded in part,* 591 F.2d 1347 (4th Cir.), *aff'd on rehearing,* 602 F.2d 653 (4th Cir.1979) (en banc).

■ The appellants have failed to cite any persuasive evidence of actual grand jury prejudice in the preindictment stage of this criminal action. They contend in very general terms that the SI article and the adverse publicity generated by this story prejudiced them, an argument which is clearly insufficient to warrant reversal under prevailing law. *See, e.g., Beck v. Washington,* 369 U.S. 541, 549, 82 S.Ct. 955, 959, 8 L.Ed.2d 98 (1962); *United States v. Nunan,* 236 F.2d at 593.

### G. *Limit on Cross-Examination/Refusal to Sever*

■ Counsel for appellant Burke indicated at the commencement of trial they were concerned that Henry Hill would implicate Burke in criminal activities, including the Lufthansa robbery, that were unrelated to the pending charges. Counsel asked the court to restrict any examination of Hill that might elicit answers implicating Burke in other crimes. Judge Bramwell made two significant evidentiary rulings at this point in the trial. He ordered the prosecutor to warn Hill that he should limit his testimony to facts relevant to the pending criminal charges. The court also ruled that, due to the widespread publicity surrounding Lufthansa and Burke's reputed involvement in that crime, any testimony relating to Lufthansa would be limited to general discussion of a significant robbery. Counsel for Kuhn, Anthony Perla and Rocco Perla then moved to sever their trial from the Burke action, arguing that they were unduly prejudiced by the court's evidentiary rulings. This motion was denied by the court.

The Perlas and Kuhn charge on appeal that Judge Bramwell committed reversible error when he denied them the right to conduct wide-ranging cross-examination of Hill that would have exposed a serious incident of misconduct reflecting on credibility. They argue that Hill was a critical prosecution witness whose motive to fabricate—*i.e.*, to curry favor with the government and thus gain immunity for his many criminal offenses—was not fully developed at trial due to the court's evidentiary rulings. Finally, the appellants contend that the court should have at least granted their motion to sever, thereby eliminating any prejudice to their defense.

Regarding the admissibility of impeachment evidence, we have recognized that the trial judge, who can observe first hand the credibility of witnesses and general tenor of the trial, is especially well suited to resolve these issues. Hence, we have accorded the trial judge considerable discretion in this area. *United States v. Stahl,* 616 F.2d 30, 33 (2d Cir.1980); *see also United States v. Rogers,* 549 F.2d 490, 496–97 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977).

The trial court's decision to circumscribe defense counsel's efforts to impeach Hill was an appropriate exercise of its discretion. The only possible advantage to be gained by pursuing the Lufthansa line of questioning, *i.e.*, further impeaching the credibility of Hill, was substantially outweighed by the strong possibility that the jury would exaggerate the importance of this testimony. Moreover, the court did permit counsel to establish that Hill had been linked to a significant robbery. Counsel was allowed to introduce a redacted version of Hill's immunity agreement and thus the jury was fully aware of his motives for testifying. This evidence, viewed together with the additional impeachment testimony independently introduced against Hill, reveals that Hill had been thoroughly impeached at trial. No error is shown here.

■■■■■■ We also affirm the district judge's decision to deny counsel's motion to sever. The judge is empowered under Fed.

R.Crim.P. 14 to sever the trials of criminal defendants if he determines that the parties will be unduly prejudiced by a joint prosecution. That decision is committed, however, to the broad discretion of the trial judge, *see United States v. Werner,* 620 F.2d 922, 928 (2d Cir.1980); *United States v. Ochs,* 595 F.2d 1247, 1260–61 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979), and a denial of a Rule 14 motion will not be overturned on appeal unless the defendant meets the following heavy burden:

> The burden is upon a moving defendant to show facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial. The defendant must demonstrate that he suffered such prejudice as a result of the joinder, not that he might have had a better chance for acquittal at a separate trial.

*United States v. Rucker,* 586 F.2d 899, 902 (2d Cir.1978), *citing United States v. Borelli,* 435 F.2d 500 (2d Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971). The court did not abuse its discretion when denying the appellants' motion to sever. Important judicial economies were served by joining these criminal trials and the appellants have been unable to show that they were severely prejudiced or denied a fair trial because their cases were tried together.

### H. *Kuhn Inculpatory Statement*

■■■■■ On September 3, 1980, FBI agents James Byron and Thomas Sweeney visited the family home of appellant Kuhn in Swissvale, Pennsylvania. The agents asked Kuhn whether he would be willing to discuss events surrounding the 1978–79 B.C. basketball season. Kuhn inquired whether he was required to talk, and the agents responded that, although they would appreciate his cooperation, he was not legally obligated to answer their questions.

Kuhn agreed to talk with the agents, but asked that the conversation be continued outside his home. They agreed to continue the discussion in the FBI car parked outside

the Kuhn home. Once inside the car, Kuhn again asked whether he was required to speak with the agents and they explained that he was not legally bound to answer their questions. Kuhn then made several inculpatory statements.

At trial, FBI Agent Byron testified to the substance of Kuhn's admission, but omitted any reference to remarks that implicated Kuhn's co-defendants in the criminal enterprise. On appeal, Kuhn argues that the court should have suppressed this testimony because it was obtained in violation of his Fifth Amendment rights. Specifically, Kuhn asserts that since his admissions were the product of a custodial interrogation, the FBI agents should have given *Miranda* warnings before questioning him. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Both parties agree that Agents Sweeney and Byron did not apprise Kuhn of his *Miranda* rights before he admitted complicity in the point shaving scheme.

The courts have frequently been asked, in the wake of the Supreme Court's landmark *Miranda* decision, to determine the precise point at which the Fifth Amendment demands that *Miranda* warnings be given. The Supreme Court has stated that warnings are constitutionally required where the accused has been arrested or is required to submit to a "custodial interrogation." *Id.* at 444, 86 S.Ct. at 1612; *see Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) (per curiam); *Beckwith v. United States,* 425 U.S. 341, 345, 96 S.Ct. 1612, 1615, 48 L.Ed.2d 1 (1976). "Custodial interrogation" has been defined to include situations in which the accused is "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612; *see Oregon v. Mathiason,* 429 U.S. at 494, 97 S.Ct. at 713. *Miranda* warnings need not be delivered in a noncustodial interrogation even if the government's criminal investigation has reached a

stage where the defendant is the focus of the inquiry. *See Beckwith v. United States,* 425 U.S. at 345, 96 S.Ct. at 1615.

In this action, Judge Bramwell properly ruled that Kuhn's admissions were not the product of a custodial interrogation. The FBI agents advised Kuhn, at two separate points during their conversation, that he was not legally obligated to speak with them. In fact, even after he admitted complicity in the point shaving scheme, the agents left the Kuhn property without arresting or otherwise restricting his freedom. The defendant has failed to convince us on appeal that his freedom of movement was impaired or restricted by Agents Byron and Sweeney. *See Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 713 (after bringing the defendant into an interrogation room at the police station, officer [falsely] stated that defendant's fingerprints were found at the scene of the crime: held, no Miranda problems because the defendant was not arrested, nor was his freedom of movement restricted in any way when he voluntarily confessed to the crime).

### I. Bruton *Claim*

When Kuhn admitted to his complicity in the point shaving scheme, he also implicated appellants Tony Perla, Rocco Perla and Paul Mazzei. At trial, FBI Agent Byron testified to the substance of Kuhn's inculpatory statements, but omitted any specific reference to the co-defendants.[10] The appellants contend on appeal that even though Agent Byron did not specifically identify them when recounting Kuhn's statements, the jury could readily infer from his testimony that Kuhn was referring to them when confessing to complicity in the scandal. The Perlas and Mazzei argue that their Sixth Amendment right of confrontation was violated by the court's decision to permit Agent Byron to testify to the redacted confession. They contend that Kuhn's statements, as recounted by witness Byron, referred to them by implication and

---

**10.** The prosecution initially proposed that a redacted version of Kuhn's statement be read to the jury. Judge Bramwell ruled that Agent Byron should testify to his recollection of the meeting with Kuhn, using this statement to refresh his recollection.

thus should have been excised because Kuhn never testified at trial.

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court held that the admission of a non-testifying defendant's statement which implicated a co-defendant violated the Sixth Amendment Confrontation Clause. The *Bruton* rule has been fully explored by this Court. A redacted statement of a non-testifying defendant is admissible if not clearly inculpatory as to a co-defendant or vitally important to the government's case against the co-defendant, and if the court provides cautionary instructions limiting use of the statement against its maker. *See United States v. Wingate,* 520 F.2d 309, 313 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). To be clearly inculpatory, the redacted statement, standing alone, must connect a co-defendant with the crime. Thus, where the redacted statement does not mention a co-defendant's name or provide a physical description, its admission would not violate *Bruton. See United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). However, a redacted statement is clearly inculpatory where the jury is aware that *names* have been redacted and, in light of other evidence, could infer that the omitted names may have included a co-defendant's. *See United States v. Danzey,* 594 F.2d 905, 917–18 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

This Circuit has consistently dismissed *Bruton* claims in situations where, as here, the inculpatory statement of a co-defendant does not independently implicate the appellant. *See United States v. Knuckles,* 581 F.2d at 313; *United States v. Wingate,* 520 F.2d at 314. In *United States ex rel. Nelson v. Follette,* 430 F.2d 1055 (2d Cir.1970), the co-defendant confessed that he and "Oliver" had been involved in a robbery and murder. Nelson objected to the admissibility of his co-defendant's confession at their joint trial on the ground that the jury could infer from independently introduced evi-

dence that he was "Oliver." The Court rejected this *Bruton* claim, holding that the contested admission was not "clearly inculpatory" to Nelson because it alone did not serve to connect him with the crime. *Id.* at 1058.

In this action, the court properly limited Agent Byron's testimony to exclude all specific references to Mazzei or the Perla brothers. The court correctly instructed the jury that the Byron testimony could be used as evidence only against Kuhn. Moreover, the jury was not aware that Agent Byron edited Kuhn's statements to exclude specific reference to co-conspirators identified by Kuhn. *Cf. United States v. Danzey,* 594 F.2d at 917 (jury aware that names redacted). Nor was Agent Byron's testimony such that the jury could infer with confidence, based upon Kuhn's admissions standing alone, that Kuhn was identifying a particular appellant when he related his story to Agent Byron. We reject this claim as well.

The judgment of the district court is affirmed.