**DON KING PRODUCTIONS, INC., Plaintiff,**

v.

**James "Buster" DOUGLAS, John P. Johnson, Golden Nugget, Inc., and The Mirage Casino–Hotel, Defendants.**

**No. 90 Civ. 1203 (RWS).**

United States District Court, S.D. New York.

June 18, 1990.

---

Townley & Updike, New York City (Paul S. Grobman, Christopher J. Nolan, of counsel), for movant Sam Donnellon and Nat. American Sports Communications L.P.

Sidley & Austin, P.C., New York City (Robert W. Hirth, of counsel), for plaintiff.

Hunterton & Naylor, P.C., Las Vegas, Nev. (C. Stanley Hunterton, of counsel), for defendant James "Buster" Douglas and John P. Johnson.

Warshaw Burstein Cohen Schlesinger & Kuh, New York City (Robert Fryd, of counsel), for defendants The Mirage Casino–Hotel and Golden Nugget, Inc.

## OPINION

SWEET, District Judge.

Sportswriter Sam Donnellon ("Donnellon") and his employer National American Sports Communications L.P. ("National American"), the publisher of The National Sports Daily ("The National"), seek by order to show cause to quash a subpoena served by defendants James "Buster" Douglas ("Douglas") and John P. Johnson ("Johnson") upon Donnellon on June 4, 1990, to obtain evidence in a civil action between plaintiff Don King Productions, Inc. ("DKP") and defendants that is scheduled for trial on June 26, 1990. For the reasons expressed below, the motion to quash is denied in relevant part, and Donnellon is directed to appear for deposition prior to trial.

### The Facts

Facts and prior proceedings relating to the case-in-chief are set forth in the court's prior opinion of May 18, 1990 (the "May 18 Opinion"). 742 F.Supp. 741. Respecting the present motion, the undisputed facts are as follows. Donnellon is a sports reporter for The National who was assigned to cover the February 10, 1990 title bout in Japan between Tyson and Douglas. On May 31, 1990, The National ran an article written by Donnellon reporting statements alleged to have been made by Don King ("King"), World Boxing Council President Jose Sulaiman ("Sulaiman"), and the president of the Japan Boxing Commission in public to several reporters, including Donnellon, about 90 minutes after the conclusion of the fight. According to Donnellon's story, this previously unreported mini-press conference occurred after King emerged from a closed-door session with the above-noted officials and preceded a larger, widely-attended press conference that was held six hours or so after the fight.

The article (headed "Tale on this tape sheds a whole new light on King's performance in Tokyo dispute") discloses that the reporter has in "my Dad's basement in New Jersey" a micro-cassette tape of the mini-press conference upon which are recorded post-fight statements made by King that, according to Donnellon, may alter the course of the litigation.[1]

The article was published eleven days after a meeting Donnellon had with lawyers for Douglas and Johnson at which he discussed in some detail the contents of the tape and conditionally offered to provide the lawyers with a copy of the tape. In the article (and apparently in the prior conference with counsel) Donnellon reported that the tape of the mini-press conference revealed King stating that he had urged that the fight be stopped at the end of the eighth round, was going through the "normal procedures of trying to put a protest down," and that Tyson had knocked out Douglas "officially in the ring."

> With characteristic rhetoric, King tells The National's Donnellon and three other reporters that he "tried to stop" the fight in the eighth round after Mike Tyson had floored Douglas and the referee did not pick up the count. Then, in what may be a critical violation of the "fair dealing" requirement, Kings says that after the fight "all I [could] do is voice a protest and then go through the procedures of trying to put a protest down."

1. The May 31 article appraised the prospects of the parties to this litigation as follows: "It was King and his witnesses vs. Douglas and his witnesses. Until now. Until the discovery of the basement tape." A subsequent article published by The National on June 4, 1990 (entitled "Tape could be a real King-buster for Douglas") reports as follows:

 The key to the outcome of the hearing before Sweet could be Sam Donnellon's tape of King's first set of postfight proclamations.

On June 4, 1990 (on which date The National touted for the second time the import of the Donnellon tape for this litigation), Donnellon was served with a deposition subpoena by Douglas and Johnson commanding his appearance at a deposition at which he was to produce "all documents and things ... constituting or relating or referring to" any statement made by King concerning the Douglas–Tyson fight. The order to show cause to quash the subpoena followed, upon which argument was heard on June 12.

*The Reporter's Privilege under New York Law*

■ "[I]n a diversity case the existence of a privilege is to be determined by reference to state law...." *Application of American Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir.1989) (citing *Dixon v. 80 Pine Street Corp.*, 516 F.2d 1278, 1280 (2d Cir. 1975) and Fed.R.Evid. 501); *Republic Gear Co. v. Borg–Warner Corp.*, 381 F.2d 551, 555–56 n. 2 (2d Cir.1967) (state rules of witness privilege are substantive for *Erie* purposes). *See also Bamco 18 v. Reeves*, 685 F.Supp. 414 (S.D.N.Y.1988); *Bower v. Weisman*, 669 F.Supp. 602 (S.D.N.Y.1987); *Drimmer v. Appleton*, 628 F.Supp. 1249, 1250 (S.D.N.Y.1986). Therefore, in this diversity action (absent conflicting federal constitutional concerns) the law of the forum state, New York, provides the rules of decision as to the scope of the privilege accorded a reporter, such as Donnellon, against whom discovery is sought.

Donnellon and The National concede that the tape in question records nonconfidential statements of publicly-reported, hence non-secret, sources (*viz.*, King, Sulaiman and the Japanese Boxing Council President) that were expressed in a public setting to several reporters. Movants therefore disclaim reliance upon the New York Shield Law, N.Y.Civ.Rights Law § 79–h (McKinney 1982 Supp.), which at present protects only such information as was gathered by a reporter under a cloak of confidentiality.[2] Instead, Donnellon and his employer rest upon the constitutionally-implied reportorial privilege recognized by the New York Court of Appeals in *O'Neill v. Oakgrove Construction*, 71 N.Y.2d 521, 528 N.Y.S.2d 1, 523 N.E.2d 277 (1988).

In *O'Neill*, the court held that

Article I, § 8 of the New York State Constitution, and we believe, the First Amendment of the Federal Constitution as well, provide a reporter's privilege which extends to confidential and *nonconfidential materials* and which, albeit qualified, is triggered where the material sought for disclosure ... was prepared or collected in the course of newsgathering.

71 N.Y.2d at 524, 528 N.Y.S.2d at 1–2, 523 N.E.2d 277–78 (emphasis added). Whether the First Amendment indeed compels protection against disclosure by a reporter of materials that are concededly non-secret and were gathered under conditions contradictory of confidence need not detain resolution of the motion to quash,[3] in view of

**2.** *See Matter of Knight–Ridder Broadcasting v. Greenberg*, 70 N.Y.2d 151, 155–57, 518 N.Y.S.2d 595, 511 N.E.2d 1116 (1987). Amendments to the New York Civil Rights Law that are to become effective on November 1, 1990 will extend a qualified privilege (as opposed to the absolute protection the New York legislature has bestowed on newspapers engaged in confidential information gathering) to non-confidential information that remains unpublished. *See* 1990 N.Y.Laws 33, A.B. No. 3326–B.

**3.** The United States Supreme Court to this date has not recognized any reporter's privilege, *see Branzburg v. Hayes*, 408 U.S. 665, 682–83, 92 S.Ct. 2646, 2657–58, 33 L.Ed.2d 626 (1972), yet one extending so far as to protect non-confidential information the gathering and preservation of which, absent a privilege, is chilled, if at all,

not by the threat of exposure of a source or confidence but rather, the potential albeit predictable economic cost to a news organization or reporter of having on occasion to appear in a judicial proceeding and furnish such preserved, non-confidential records. The Court of Appeals for this Circuit in several instances has read a reporter's privilege into the First Amendment, but no case appears to have presented facts requiring it to hold that the privilege protecting "the confidentiality of a journalist's sources," Tribe, *American Constitutional Law* § 12–22, at 972 (2d ed.), protects equally against non-disclosure of non-confidential information. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 143 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987) (noting that privilege did not depend upon confidentiality of relationship between reporter and *source* with-

the adequate and independent state constitutional ground relied upon by the New York Court of Appeals and the adoption, by that court, of the "three-prong test articulated in the Federal courts" to determine whether such privilege in a given case has been overcome. *See O'Neill,* 71 N.Y.2d at 529, 528 N.Y.S.2d at 5, 523 N.E.2d at 281. In administering that test, cognizance is taken of the *O'Neill* court's admonition that

> this test is but a complement to the general principles governing compelled disclosure.... Under [New York] discovery statutes and case law, competing interests must always be balanced; the need for discovery must be weighed against any special burden to be borne by the opposing party. Thus, in deciding whether to order disclosure of photographs prepared or obtained in the course of newsgathering, a court would consider the extent, if any, that press activities will be affected and, if so, whether such is justified by the interest to be served. Together with the particularized constitutional test we recognize today, these basic protections pertaining to discovery are, of course, wholly available to control disclosure in this sensitive area.

*Id.* (citations omitted).

### The Three Prong Test

 Donnellon has made a *prima facie* assertion of the privilege by establishing that at the time the tape was made, he was professionally engaged in newsgathering with the intent "to disseminate information to the public and that such intent existed at the inception of the newsgathering process." *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 144–45 (2d Cir. 1987). To overcome the privilege, defendants therefore must show that the information sought is: (1) highly material and relevant; (2) necessary or critical to the maintenance of the claim; and (3) not obtainable from other available sources. *United States v. Burke,* 700 F.2d 70, 76–77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983), *cited with approval in O'Neill,* 71 N.Y.2d at 528 n. 2, 528 N.Y.S.2d at 4 n. 2, 523 N.E.2d at 280 n. 2. Douglas and Johnson have met that burden, making a showing of sufficient clarity and specificity to warrant abrogation of any privilege recognized in *O'Neill.*

At issue here are the second and third parts of the test, as movants concede that the Donnellon tape contains information that is highly material and relevant to the litigation. With respect to the second dimension, of criticality, Donnellon and The National begin from the disadvantaged position of having, respectively, reported and published assessments of the Donnellon tape that explicitly vouch for the tape's importance to the litigation, going so far as to suggest the tape has outcome-determinative weight. Counsel for movants, nevertheless, argues that the information contained on the tape is merely duplicative or cumulative of evidence otherwise available to defendants Douglas and Johnson. The burden is on defendants to show otherwise. *Burke,* 700 F.2d at 77.

Douglas and Johnson have done so. Central to the resolution of the breach of contract claim brought against Douglas is whether the "ringside *and* post-bout conduct" of DKP's president, Don King, violated the duty of good faith and fair dealing owed to Douglas. May 18 Opinion at 766 (emphasis supplied), 771 (noting this "to be the only issue for trial on the breach of contract claim"). Disputed issues of fact bearing directly on that question include whether King sought to stop the fight from continuing at the end of the eighth round; if so, what his purpose and motivation were in doing so; and whether, after the fight, he pursued a course of speech and conduct

out addressing appropriateness of extension of privilege by other cited courts to non-confidential *information* ); *United States v. Burke,* 700 F.2d 70, 76 (2d Cir.1983) (noting importance of preserving confidentiality of journalists' *sources* ). In at least one recent instance, this district court has held the privilege has the far-reaching scope found in *O'Neill. See United States v. Imelda Marcos,* Cr. No. 87–598, 1990 WL 74521 (S.D.N.Y. May 31, 1990), 1990 U.S. Dist. LEXIS 6541 ("protection of the qualified privilege extends to nonconfidential as well as confidential sources and information").

having as its end the impairment of Douglas' claim to the heavyweight title. The importance of the tape must be assessed in terms of its bearing on those issues.

As reported by Donnellon, the tape contains verbatim statements King made shortly after the fight which constitute direct and probative evidence of his demeanor and intended course of action post-bout (including, apparently, his intent to go through procedures to protest Tyson's defeat). In addition, the tape contains what may be an admission by King that his ringside conduct during the fight amounted to more than a disinterested challenge to the long count in that, according to excerpts from the tape set out in Donnellon's article, King indicated at the mini-press conference that it was his intention at the close of the eighth round to prevent the fight from continuing. *Cf.* May 18 Opinion at 766 n. 26 (noting King's statement that he brought the long count to the attention of officials for purposes other than "to stop the fight.")

Information on the tape may therefore prove critical to the success at trial of Douglas' "good faith and fair dealing" defense and certainly the statements identified "go to the heart of" the issues in contention. *See Dooley v. Boyle,* 140 Misc.2d 171, 531 N.Y.S.2d 158 (Sup.Ct.1988) (post-*O'Neill* decision finding non-party reporter's notes of conversations to be crit-

ical given that accuracy of published statements of party were central to resolution of dispute).[4] Indeed, as a precise rendering of King's words and inflection captured relatively soon after the bout the tape assumes additional significance in this case since the "vigor and motivation," Opinion at 766, with which King undertook his actions respecting the outcome of the Douglas–Tyson fight has been identified as a material issue the determination of which will depend upon close judgments from among competing explanations. *Id.* at 769.

This taped evidence may not easily be discounted as "serving a solely cumulative purpose." *Burke,* 700 F.2d at 78. Unlike the tape, the testimony of non-party Dean Gettleson adverted to in the May 18 Opinion (p. 766) does not address King's conduct and demeanor at this mini-press conference (which Gettleson did not witness), and, according to Donnellon, at the subsequent press conference (which was widely attended and for which there are witnesses), King was uncharacteristically reserved. Thus, the instant case stands apart from others in this district, such as *Bradosky v. Volkswagon of America, Inc.,* No. M8–85, 1988 WL 5433 (S.D.N.Y. Jan. 15, 1988), 1988 U.S. Dist. LEXIS 571 (S.D.N.Y.1988) and *United States v. Gambino,* Cr. No. 88–919 (S.D.N.Y. April 12, 1990), 1990 U.S. Dist. LEXIS 4026 (in the latter of which the court nevertheless proceeded with *in camera* review), where tapes or notes of a

---

**4.** Quoting out of context from the May 18 Opinion denying cross-motions for summary judgment on the breach of contract claim, counsel for Donnellon and The National argues that the tapes cannot truly be central to the success of defendants' claim because the court already has determined that the evidence establishes that King "would appear to have breached [his] duty to Douglas." *See* Reply Mem. at 6 (quoting Opinion at 768). This appears to confuse summary judgment standards with those governing proof at trial. The passage containing the quoted conclusion—set out in full below—rested explicitly upon asserted facts the truth and evidentiary value of which was not established but assumed for purposes of testing whether summary judgment was available to King, and the genuinely disputed nature of which served as the basis for denial of the cross-motion of Douglas and Johnson for summary judgment. *See* May 18 Opinion at 768:

Applying that provisional standard to the *asserted facts of King's conduct,* DKP would appear to have breached its duty to Douglas by acting in other than an impartial manner (a) to stop a fight which Douglas had bargained for the opportunity to win without DKP's interference, and, thereafter, (b) to question the propriety of Douglas' apparent victory, contributing thereby to the cloud over his title and jeopardizing recognition of his victory by certain of the boxing governing bodies. As *DKP disputes several of the facts contended by defendants Johnson and Douglas to have transpired, and credibility determinations may be necessary to resolve competing inferences as to party intent that arise from undisputed facts,* the issue of whether DKP did actually and materially breach the implied duty of good faith and fair dealing must await determination at trial.

reporter were found to be merely cumulative in nature to evidence already admitted into the record. *See also United States v. Imelda Marcos*, Cr. No. 87–598, 1990 WL 74521 (S.D.N.Y. May 31, 1990), 1990 U.S. Dist. LEXIS 6541 (Government denied access to CBS outtakes where court found, among other things, that evidence sought would be cumulative in that "a significant portion of the testimony given in this case" already controverted the defense in question). Here, the tape contains non-cumulative information critical to the defense Johnson and Douglas intend to pursue at trial, satisfying the second element of the test.

Johnson and Douglas also have satisfied the third requirement—that the tape contain evidence not obtainable from another available source. Donnellon's article indicates that, apart from the other reporters present at the mini-press conference (who, since equally free to invoke the reporter's privilege, are no more or less available than Donnellon), in attendance were King, Sulaiman, and the president of the Japan Boxing Association, Shigera Kojima ("Kojima"). King (the president of party-plaintiff DKP) and Sulaiman (the head of the WBC) have been deposed in this litigation. Counsel for Douglas, Johnson and The Mirage represent, without serious challenge from movants, that King and Sulaiman were asked at deposition questions responsive answers to which would have required communicating, in sum and substance, the information set forth on the tape. Defense counsel further represent that the version of events related by King and Sulaiman at deposition differs from that reportedly contained on the tape. Further questioning of these two witnesses is unnecessary to establish that the taped information literally "is not obtainable" from these two sources.

The remaining witness, Kojima, is a resident of Japan and therefore apparently beyond the subpoena power of the court. Defense counsel, by affidavit unchallenged by Donnellon and The National, state their understanding that Japanese law does not permit compelled depositions. A procedure akin to Letters Rogatory is available, but it is represented to the court that employment of that procedure would require a minimum of one and one-half months. In view of the impending trial date of June 26, Kojima is not in any practical sense an "available source" for the information reported to exist on the tape.

Thus, even without considering whether an "ear-witness" account of King's statements would, in any event, properly serve in the stead of a word-for-word sound recording[5] (particularly in a case in which the "vigor and motivation" with which actions were taken may determine the outcome), Johnson and Douglas have met their burden of exhausting all available sources of the information. Accordingly, under the three-part test articulated by this Circuit and adopted by the New York Court of Appeals in *O'Neill*, it is appropriate in this instance that the reporter's privilege be pierced. Donnellon shall be required to produce his tape.

■ That conclusion is reached with conviction that production will do no harm to the "public interest in the maintenance of a vigorous, aggressive and independent press." *Burke*, 700 F.2d at 77. Disclosure of a public figure's statements that already have been published in part in an article which identified the non-secret source of the speech acts in question hardly imperils "the important interests of reporters and the public in preserving the confidentiality of journalists' sources...." *Id.* at 76–77. Nor is this a case implicating the chill that can arise from forced revelation of information obtained in confidence by a reporter (even from a non-secret source), since concededly King's tape-recorded statements were openly and publicly uttered.

Any impact upon press interests here relates solely to the worry of the Fourth Estate "becoming de facto investigative agencies for litigants." *Dooley v. Boyle*, 531 N.Y.S.2d at 161. It does not diminish the general significance of that concern to recognize its limited force in the instance of

---

5. *See United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) (verbatim statements of witnesses contained in videotape "[b]y their very nature ... are not obtainable from any other source. They are unique bits of evidence that are frozen at a particular place and time.").

a reporter and paper that take steps to advertise possession of information reportedly of crucial import to a particular litigation and, in their own reportage, fully anticipate the disclosure of such information in connection with the trial. Donnellon apparently did not feel overly burdened by production when he first offered the tape to the lawyers for the defense or when he later implied he would produce it in his May 31 article. That he no longer is of so generous a mind does not establish any substantial detriment to the rights protected by the First Amendment or Article I, Section 8 of the New York Constitution that will arise from requiring him to carry through with his earlier plan.

In sum, upon considering "the extent, if any, that press activities will be affected and ... whether such is justified by the interest to be served," *O'Neill*, 71 N.Y.2d at 529, 528 N.Y.S.2d at 5, 523 N.E.2d at 281, it is concluded in the present instance that the right of the public "to every man's evidence" must prevail. *Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980) (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)), *quoted in Application of American Tobacco Co.*, 880 F.2d 1520 (2d Cir.1989).

*Conclusion*

The motion to quash is denied to the extent that Donnellon must produce the tape recording identified in his article in The National of May 31, 1990, as further described in The National edition of June 4, 1990. Donnellon shall also appear for deposition, at which his examination shall be limited to only such matters as bear upon the creation and admissibility of the tape, including (1) whether and to what extent the tape has been edited and (2) whether the tape is an accurate recording of the questions that were put to King, and the responses given by King, at the press conference in question. In all other respects the motion to quash is granted.

It is so ordered.