Janet SACKMAN, et al., Plaintiffs,

v.

The LIGGETT GROUP,
INC., Defendants.

No. CV 93–4166 (ADS).

United States District Court,
E.D. New York.

March 19, 1996.

358

Kenneth B. McClain, and Gregory Leyh, Humphrey, Farrington & McClain, P.C., Independence, Missouri, David W. Sackman, Kelly, Sackman, Spollen & Upton, Greenlaw, New York, for Plaintiffs.

James V. Kearney, and Jeffrey M. Goodman, Latham & Watkins, New York City, for Defendants.

## MEMORANDUM OPINION
## AND ORDER

BOYLE, United States Magistrate Judge.

This is a diversity action. The plaintiffs, Janet and Joseph Sackman (hereinafter called the "Sackmans"), are citizens of New York. The defendant tobacco company, The Liggett Group, Inc. (hereinafter called "Liggett") is a Delaware corporation. The Sackmans are suing Liggett for damages resulting from the cancer plaintiff Janet Sackman suffered, allegedly caused by her use of Liggett's product, Chesterfield cigarettes.

Currently before this court is the determination of the applicability of several privi-

leges asserted by Liggett with regard to documents related to scientific research projects into medical issues relating to tobacco use conducted by the Council on Tobacco Research, Special Projects. Liggett has submitted 123 documents for *in camera* review by the court to which it claims the attorney-client and/or work-product privilege. The court has reviewed the documents. The parties have submitted supporting documents and briefs on the law. The court heard oral argument on January 22, 1996.

## I. *Contentions of The Parties and Background*

The documents at issue involve the Council on Tobacco Research (hereinafter called "CTR"), an entity existing pursuant to the laws of the State of New York which funded allegedly independent unbiased scientific research relating to any causal nexus between tobacco use and health. All the members of CTR are tobacco companies including the defendant, Liggett. CTR is the successor of the Tobacco Industry Research Committee ("TIRC"), formed by several tobacco companies in 1954. The purpose of its formation is embodied in a document entitled "A Frank Statement to the Public—By the Makers of Cigarettes" ("Frank Statement"). The Frank Statement was published in several national newspapers, and in part states:

> We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business. We believe the products we make are not injurious to health.... We are pledging aid and assistance to the research effort into all phases of tobacco use and health.... In charge of [the TIRC] will be a scientist of impeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. Frank Statement, Exhibit "B" to *Letter*, dated November 21, 1995 from plaintiff's counsel Kenneth B. McClain.

Although Liggett was not one of the founding members of TIRC, it became a member in 1964. During testimony before Congress in 1994, Dr. James F. Glenn, then Chairman of CTR, reconfirmed the mission, testifying that CTR "seek[s] scientific truth" on tobacco and related health issues. *Regulation of Tobacco Products: Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce,* 103rd Cong., 2d Sess. 103–153 at 341 (April 28, May 17 and 26, 1994) (testimony of James F. Glenn, Chairman, Council for Tobacco Research, USA).

CTR funded scientific research projects through research grants and awards. *Letter of James Kearney,* dated November 22, 1995 at 2. Liggett states that many of the research projects it supported were also provided funding by "the federal government and various national health organizations such as the National Institute of Health, the National Cancer Institute, the Environmental Protection Agency, the American Cancer Society, and the American Heart Association...." *Id.* Liggett asserts that all researchers were free to publish their research results, including Special Projects researchers involved here, and all such projects undertaken by CTR are reported in CTR's annual reports which are available to the public.

There are two methods of scientific research grant funding through CTR. The first is its grant-in-aid program, under which research proposals are reviewed by CTR's Scientific Advisory Board (also referred to as "SAB"), comprised of eminent, independent scientists in their respective fields. The SAB makes decisions on whether research requests should be funded by CTR. The second funding method was through CTR's Special Projects, in which the tobacco companies themselves, on the advice and recommendation of counsel, decide whether or not to approve a request for funding. Liggett claims that Special Projects funded research that a member tobacco company, or companies, believed would be beneficial in future litigation or Congressional hearings. SAB did not participate in any way in the selection process.[1]

---

1. There is a third method of funding scientific research projects—through Special Accounts. Although the details of this funding method are not entirely clear, Special Accounts were maintained by the law firm of Jacob & Medinger, outside counsel to both the CTR and R.J. Reyn-

The Sackmans seek discovery of the 123 documents relating to Liggett's participation in CTR Special Projects program, asserting that the documents are not privileged, and if they are, they fall within the crime-fraud exception to the privilege.

Although there is some overlapping, the documents fall into three main categories. The first category, comprising the overwhelming majority of the documents, are documents to or from counsel relating to specific scientific projects, either conducted or recommended to be conducted, under CTR Special Projects. The second category consists of documents of minutes and agenda of meetings of various general counsel to the tobacco companies in which CTR Special Projects, or a particular project, is discussed. The third category consists of documents relating to meetings held by tobacco company executives wherein CTR Special Projects were discussed. Two miscellaneous documents involve a description of various methods of tobacco product research and public relations, and annual budget expenditures by Liggett for research and other legal expenses, which include references to CTR Special Projects.

The Sackman's fraud argument is based on the claim that CTR was held out to the public to be an independent non-profit entity dedicated to scientific research to serve the interests of public health. *Letter of Kenneth B. McClain*, dated November 28, 1995 at 3. The Sackmans assert that CTR Special Projects did not fund independent research on health related smoking issues for the public good, but instead focused on research likely to produce findings—intended for public relations purposes and in the tobacco companies' economic interest—that would disprove or undermine any causational link between health and the use of tobacco products. The Sackmans point to the counsels' distinct role in the selection of research for Special Projects and to the absence of participation by SAB to support their claim that Special Projects lacked scientific value, and was devoid of any concern with public health issues.

Liggett implicitly acknowledges the lack of any independence in CTR's goals with respect to Special Projects by asserting that the projects were undertaken to assist in the defense of anticipated litigation against member tobacco companies. Liggett asserts that the scientists and/or medical physicians involved in Special Projects research were free to publish their results. Examples of such publishings reflect that, although a project was identified by a Special Project grant number, there was no statement that the project was undertaken for purposes of defense in litigation, nor was there any indication that the project had not been approved by the SAB. Liggett claims the attorney-client, joint defense and attorney work-product privileges asserting that CTR Special Projects was funded by the individual tobacco companies on the advice of their counsel for purposes of defending unspecific but anticipated litigation.

Previous litigation in New Jersey involved the 123 documents involved here, in addition to many others. In *Haines v. Liggett Group, Inc.* the federal magistrate judge appointed a special master to review over 1500 documents relating to CTR and the various tobacco companies named as defendants,[2] including Liggett. The special master found that the documents were protected by the attorney-client privilege. The Magistrate Judge confirmed this and further found that the documents did not fall within the crime-fraud exception. This decision was reversed by the District Court, *Haines v. Liggett Group Inc.*, 140 F.R.D. 681 (D.N.J.1992) (then District Judge now Circuit Judge Sarokin), on the ground that there was ample evidence to support the plaintiffs' claim that Special Projects was part of a public relations fraud

---

olds Tobacco Co., and used for litigation-related research projects, such as research by experts in preparation for testimony for a particular case or legislative hearings. CTR and/or the tobacco company involved would reimburse the law firm for this expense. *See* Lisa Bero, et al., "Lawyer Control of the Tobacco Industry's External Research Program," *Journal of the American Medi-*

*cal Association* Vol. 274, No. 3, 241, 242 (1995). When questioned about the special accounts at oral argument, Liggett's counsel provided no additional information.

**2.** The other tobacco companies are Phillip Morris, Inc. and R.J. Reynolds Tobacco Co.

perpetrated on an unknowing public by using the credibility of CTR and its independent board of scientists to publicize the results of secret research projects undertaken, on the advice of tobacco company counsel, to undermine research results that had found a causal nexus between smoking and illness. The Third Circuit vacated the District Court's ruling, on the ground that the District Court had considered documents and information outside the record before the magistrate judge. *Haines v. Liggett Group, Inc.,* 975 F.2d 81 (3d Cir.1992).[3]

## II. *Conflicts of Law*

### A. *Rule 501—Governing Privilege Laws*

There is a threshold choice of law issue, which is essential before engaging in a discussion on the merits of the parties' assertions. Discovery of privileged material in a civil case is governed by Rule 26(b)(1) of the Federal Rules of Civil Procedure, which provides that the parties "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." Federal courts are further guided on the issue of discoverability of privileged material by Rule 501 of the Federal Rules of Evidence which states that in diversity cases the court should apply state law with respect to privilege issues. Rule 501 provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

The "rationale underlying [Rule 501] is that federal law should not supersede that of the States in substantive areas such as privilege absent a compelling reason." Notes of Comm. on the Judiciary, H.R. No. 93–650.

■ If the privilege question relates to claims which will be decided under substantive state law, then the state's privilege law applies. *Application of American Tobacco Co.,* 880 F.2d 1520, 1527 (2d Cir.1989); *Republic Gear v. Borg–Warner Corp.,* 381 F.2d 551, 555–56 n. 2 (2d Cir.1967); *Riddell Sports Inc. v. Brooks,* 158 F.R.D. 555, 560 (S.D.N.Y. 1994) (in a diversity case, New York attorney-client privilege law applicable where New York law applicable to all substantive claims).

■ Federal jurisdiction here is based solely on diversity. The Sackmans' claims are based upon New York causes of action, which will be decided by New York law. Thus, New York attorney-client privilege law is applicable under Rule 501, Fed.R.Evid.

### B. *New York Choice of Law*

■ Once the court determines that state substantive law applies, it must next look to the forum state's conflict of laws principles to determine whether any other law applies. *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In *Farmland Dairies v. Barber,* 65 N.Y.2d 51, 489 N.Y.S.2d 713, 478 N.E.2d 1314 (N.Y.1985), New York's highest court held that where "litigation involv[es] multistate contacts of parties residing in different States ... the forum State is free to resolve those conflicts and choose the applicable law based upon an evaluation of the State contacts with the parties and the transactions." *Farmland Dairies,* 65 N.Y.2d at 58, 489 N.Y.S.2d 713, 478 N.E.2d 1314.

■ New York courts will apply the law of the state having the greatest concern with the issue raised. *Accusystems, Inc. v. Honeywell Information Systems,* 580 F.Supp. 474 (S.D.N.Y.1984). *Accusystems*

---

**3.** Subsequent to the Third Circuit's decision, the plaintiff's attorney had moved to be relieved as *pro bono* counsel, which the District Court denied. *Haines v. Liggett,* 814 F.Supp. 414 (D.N.J. 1993). Thereafter, there is no reported activity in the case.

involved a diversity action in which the plaintiff alleged claims sounding in both tort and contract law. The court, in analyzing which law should be applied, stated that "New York courts apply the law of the state having 'the greatest concern with the specific issue raised in the litigation.'" *Id.* at 480.

The court in *David Tunick, Inc. v. E.W. Kornfeld*, 813 F.Supp. 988 (S.D.N.Y.1993) summarized the state of New York law as follows:

> New York utilizes an interest analysis approach to choice of law problems. Under New York conflicts principles, 'the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.' The Court must evaluate the nexus between each jurisdiction and the controversy in light of the policies and purposes to be vindicated by the conflicting laws. The Court will apply the laws of the jurisdiction which has the greatest interest in, and is most intimately concerned with, the outcome of a given litigation. Thus, under New York conflicts principles, controlling effect is accorded to the law of the jurisdiction 'which has the greatest concern with, or interest in, the specific issue raised in the litigation.'

*Id.* at 994.

■ New York courts (and federal courts sitting in New York) have seldom addressed the choice of law issue regarding the assertion of a privilege. In *Detroit Coke Corp. v. NKK Chemical USA, Inc.*, 1993 WL 367060 (W.D.N.Y.1993), the court recognized the lack of authority on this issue, holding that "[a]lthough not without some apparent and not uncommon confusion in this area of jurisprudence, New York case authorities appear predominantly to apply the so-called 'grouping of contacts' approach, or its proximate variation, in determining the choice of applicable privilege rules." *Id.* at *1. Similarly, the center of gravity or grouping of contacts test has been applied in determining what

law is applicable to the assertion of the attorney-client privilege. *Brandman v. Cross & Brown Co. of Florida, Inc.*, 479 N.Y.S.2d 435, 436, 125 Misc.2d 185 (N.Y.Sup.1984). That court held that New York law was applicable to the assertion of the attorney client privilege, based upon the center of gravity or grouping of contacts rules, even though "Florida law may govern other portions of the controversy." *Id.* In *Shaklee Corp. v. Oberman*, 1993 WL 378268 (S.D.N.Y.1993), the court, sitting in diversity, held that New York law was applicable to the issue of attorney-client privilege where the action was for attorney malpractice. The court reasoned that "New York has the predominant interest in issues involving legal malpractice allegedly committed by a New York attorney with respect to the performance of his duties in this state. Accordingly, New York law governs any questions of privilege." *Id.* at *1.

Based on the foregoing, it is clear that New York privilege law is applicable to Liggett's assertion of the attorney-client privilege. Although Liggett is incorporated in Delaware, the plaintiffs are New York citizens; plaintiff Janet Sackman was a resident of New York when she smoked Liggett's tobacco product, and when she was allegedly harmed by that product. Liggett sold, marketed and advertised its products in New York. The documents which Liggett claims are privileged concern Liggett's role in the CTR, an entity headquartered and existing pursuant to the laws of New York.[4] There is no other state which has a greater interest in the application of its laws to this case. Thus, the court will apply New York law in its determination of the attorney-client privilege issues presented.

### III. *Discussion*

#### A. *Attorney–Client Privilege*

■ New York's provision for the privilege is found in New York Civil Practice Laws and Rules, § 4503, which in relevant part states:

> Unless the client waives the privilege, an attorney or his employee ... who obtains

---

4. Liggett's counsel at oral argument stated that CTR was either a non-profit corporation or a membership corporation formed under New

York law. Although Liggett's counsel made post-argument submissions, there was no further clarification provided on this issue.

... a confidential communication ... made between the attorney or his employee and the client in the course of professional employment shall not disclose, or be allowed to disclose such communication, in any action.... N.Y.Civ.Prac.Law § 4503(a) (McKinney 1992).

The party asserting the privilege has the burden of establishing all the essential elements. *Spectrum Systems International Corp. v. Chemical Bank,* 575 N.Y.S.2d 809, 78 N.Y.2d 371, 581 N.E.2d 1055 (N.Y.1991); *People v. Mitchell,* 461 N.Y.S.2d 267, 58 N.Y.2d 368, 448 N.E.2d 121 (N.Y.1983); *Matter of Grand Jury Subpoenas served upon Doe,* 536 N.Y.S.2d 926, 927, 142 Misc.2d 229 (N.Y.Sup.1988). The applicability of the privilege should be determined on the facts surrounding each individual case. *Boller v. Barulich,* 557 N.Y.S.2d 833, 835, 147 Misc.2d 502 (N.Y.City Civ.Ct.1990).

The Court of Appeals has set down the following principles regarding the protection of the privilege:

> [The attorney-client] relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services ... Second, not all communications to an attorney are privileged. In order to make a valid claim of privilege, it must be shown that the information sought to be protected from disclosure was a 'confidential communication made to the attorney for the purpose of obtaining legal advice or services'.... Third, the burden of proving each element of the privilege rests upon the party asserting it.... Finally, even where the technical requirements of the privilege are satisfied, it may, nonetheless, yield in a proper case, where strong public policy requires disclosure. *Priest v. Hennessy,* 431 N.Y.S.2d 511, 51 N.Y.2d 62, 68–69, 409 N.E.2d 983 (N.Y.1980).

*See also, Matter of Grand Jury Subpoena of Stewart,* 545 N.Y.S.2d 974, 977, 144 Misc.2d 1012 (N.Y.Sup.1989).

■ The attorney-client privilege extends to information given by the client to the attorney, as well as "professional advice given by an attorney that discloses such information." *In re Six Grand Jury Witnesses,* 979 F.2d 939, 944 (2d Cir.1992), *cert. denied sub nom., XYZ Corp. v. U.S.,* 509 U.S. 905, 113 S.Ct. 2997, 125 L.Ed.2d 691 (1993) (citing *Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981)); *Rossi v. Blue Cross and Blue Shield of Greater New York,* 542 N.Y.S.2d 508, 510, 73 N.Y.2d 588, 540 N.E.2d 703, 705 (N.Y. 1989). The New York Court of Appeals has described the requisite legal character of the communication required:

> In order for the privilege to apply, the communication from attorney to client must be made 'for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship.' *Rossi v. Blue Cross & Blue Shield,* 73 N.Y.2d 588, 593, 542 N.Y.S.2d 508, 540 N.E.2d 703. The communication itself must be *primarily or predominately of a legal character....* *Spectrum,* 575 N.Y.S.2d at 814, 581 N.E.2d at 1060 (citation omitted) (*emphasis added*).

Thus, the privilege only arises when "a person contacts an attorney for the purpose of obtaining legal services or advice." *Application of D'Alessio,* 589 N.Y.S.2d 282, 284, 155 Misc.2d 518 (N.Y.Sup.1992); *see also People v. Osorio,* 75 N.Y.2d 80, 549 N.E.2d 1183, 1185, 550 N.Y.S.2d 612, 614 (N.Y.1989) (privilege attaches if "information is disclosed in confidence to the attorney for the purpose of obtaining legal advice or services."); *Civil Service Employees Ass'n, Inc. v. Ontario County Health Facility,* 103 A.D.2d 1000, 478 N.Y.S.2d 380, 381 (N.Y. 4th Dep't 1984) (statements by witnesses to county attorney during investigation not shielded by attorney-client privilege) (citing *Priest v. Hennessy,* 51 N.Y.2d 62, 68–69, 431 N.Y.S.2d 511, 409 N.E.2d 983 (N.Y.1980) and *People v. Belge,* 59 A.D.2d 307, 309, 399 N.Y.S.2d 539 (N.Y.1977)). The "mere fact that a communication is made directly to an attorney, or an attorney is copied on a memorandum, does not mean that the communication is necessarily privileged." *U.S. Postal Service v. Phelps Dodge Refining Corp.,* 852 F.Supp. 156, 160 (E.D.N.Y.1994).

■ Liggett has failed to sustain its burden of establishing the elements of the attorney-client privilege with respect to the docu-

ments at issue. More specifically, it has failed to demonstrate that the documents at issue relate to the rendition of legal advice or legal services. The documents involve communications by tobacco company executives and in-house counsel and outside counsel relating to CTR Special Projects research. Liggett claims that the communications were appropriate legal advice and/or work-product[5] for the purpose of developing evidence for future litigation.

■ *In camera* review of the Special Projects portions of documents did not reveal any confidential legal communications exchanged in the documents, nor the rendering of legal advice. The fact that the documents were prepared by counsel, and in some instances shared by counsel, does not cloak the document with the attorney-client privilege when such documents do not reveal a confidential legal communication from the client, or impart legal advice from the attorney. *In the Matter of Baker*, 528 N.Y.S.2d 470, 472–73, 139 Misc.2d 573 (N.Y.Sup.1988). The documents instead demonstrate that the attorneys were serving a function other than that of a legal advisor. Counsel to the tobacco companies were functioning in a scientific, administrative, or public relations capacity in taking the action that they did. The role delegated to the attorneys was one that could have been performed by the Scientific Advisory Board, a doctor or scientist, or a tobacco company executive. *See Leonen v. Johns–Manville*, 135 F.R.D. 94, 99 (D.N.J.1990) (no privilege where the "service rendered could have been rendered by any corporate agent who was not a lawyer" (citation omitted)); *In re Air Crash Disaster at Sioux City, Iowa*, 133 F.R.D. 515, 519 (N.D.Ill.1990) ("although a document is sent to an attorney, if the role of counsel is 'minor or perfunctory' or was intended merely to immunize the document from the production" the privilege is inapplicable (citation omitted)). Since the documents are not "primarily of a legal character" they do not fall within the attorney-client privilege. *Cooper–Rutter Associates, Inc. v. Anchor National Life Insurance Co.*, 168 A.D.2d 663, 563 N.Y.S.2d 491, 491 (2d Dep't 1990).

Liggett's claim that its attorneys evaluated the projects in terms of litigation is without merit. When specific litigation and legislative hearing research arose, this work was not undertaken through Special Projects but instead through "Special Accounts," maintained by the law firm of Jacob & Medinger, outside counsel to R.J. Reynolds Tobacco and the CTR. *See* Oral Argument dated January 22, 1996, Tr. at p. 32 and Lisa Bero, et al., "Lawyer Control of the Tobacco Industry's External Research Program," *Journal of the American Medical Association*, Vol. 274, No. 3, 241, 242 (1995). *See also* Document No. 33 at RC 6033346.

### B. Compelling Public Policy Interests Require Disclosure

■ This case falls within the exception to the New York attorney-client privilege since there is a compelling public policy interest which mandates disclosure; namely, an overriding concern with protecting the public health. The attorney-client privilege is not absolute. In an appropriate case it must yield "where strong public policy requires disclosure." *Priest, supra*, 51 N.Y.2d at 69, 431 N.Y.S.2d at 514, 409 N.E.2d at 986; *see also, United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir.1991) (attorney-client privilege "cannot stand in the face of countervailing law or strong public policy"); *Leucadia, Inc. v. Reliance Ins. Co.*, 101 F.R.D. 674 (S.D.N.Y.1983) (recognizing that a strong public policy may require disclosure); *see also Leonen v. Johns–Manville*, 135 F.R.D. 94 (D.N.J.1990) (where the court in asbestos litigation ordered disclosure of documents claimed to fall within the attorney-client privilege under New Jersey's more stringent public policy exception, where the documents may demonstrate knowledge of the health risks associated with its product).

A compelling interest in public health requires disclosure of the documents.

### C. Joint Defense Privilege

■ New York affords the parties' shared attorney-client communications privilege status when made for the purpose of

---

**5.** This is also discussed *infra* under the work-     product privilege.

"mounting a common defense." *People v. Osorio,* 75 N.Y.2d 80, 549 N.E.2d 1183, 1186, 550 N.Y.S.2d 612, 615 (N.Y.1989); *see also Kraus v. Brandstetter,* 586 N.Y.S.2d 270, 272, 185 A.D.2d 300 (N.Y.A.D. 2 Dep't 1992) (recognizing the existence of the joint defense privilege under New York law). It applies where "multiple parties are represented by separate legal counsel but share a common interests about a legal matter" but "does not extend to communications about a joint business strategy that happens to include a concern about litigation." *Walsh v. Northrop Grumman,* 165 F.R.D. 16, 18 (E.D.N.Y.1996) (citations omitted). Since the attorney-client privilege does not apply here between individual counsel and client, for the reasons stated above, it gains no further recognition from the fact that it was a joint or collective undertaking. *Walsh* recognizes that attorneys cannot be utilized as conduits of non-legal communication between parties claiming the joint defense privilege. *Id.* Liggett's joint defense privilege theory fails because Liggett and the other tobacco companies used their attorneys for non-legal purposes that involved a joint public relations business strategy to promote the economic interests of their clients. To the extent that these projects may have been of assistance in future litigation, such a benefit was incidental or secondary to the primary goal.

### D. *Work–Product Privilege*

■ Liggett claims that the work-product privilege protects all but one of the documents submitted for *in camera* inspection.[6] The applicability of the work product privilege in a diversity case is governed by federal law. *Bowne of New York City, Inc. v. AmBase Corp.,* 161 F.R.D. 258, 263 (S.D.N.Y. 1995). *See,* Federal Rule of Civil Procedure 26(b)(3).[7]

■ The privilege protects an attorney's "thought-processes includ[ing] preparing legal theories, planning litigation strate-

gies and trial tactics, and sifting through information." *In re In–Store Advertising, Securities Litigation,* 163 F.R.D. 452, 456 (S.D.N.Y.1995). The party asserting the privilege under Rule 26(b)(3) must satisfy a three-part test. First, the party must demonstrate that the information requested is either documents or otherwise tangible. Second, the document must have been prepared in anticipation of litigation. Third, the document must have been prepared by or for the party's representative. Fed.R.Civ.P. 26(b)(3); *In re Joint Eastern and Southern District Asbestos Litigation,* 119 F.R.D. 4, 6 (E.D.N.Y.1988); *In re Grand Jury Subpoenas Dated December 18, 1981, and January 4, 1982,* 561 F.Supp. 1247, 1257 (E.D.N.Y. 1982).

■ The party invoking the work product privilege must also demonstrate that the document was prepared "principally or exclusively to assist in anticipated or ongoing litigation." *Martin v. Valley Nat'l. Bank of Arizona,* 140 F.R.D. 291, 304 (S.D.N.Y.1991); *U.S. v. Construction Products Research Inc.,* 73 F.3d 464, 473 (2d Cir.1996) (party claiming privilege "generally must show that the documents were prepared principally or exclusively to assist" in litigation). The document must have been "prepared *because of* the prospect of litigation." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 448 (S.D.N.Y.1995) (*emphasis added*). If the "primary motivating purpose" in creating the materials "is other than to assist in pending or impending litigation, then the document does not receive work product protection." *In re Pfizer Inc. Securities Litigation,* 1993 WL 561125 at *3 (S.D.N.Y.1993).

■ The documents herein do not merit protection under the work-product privilege. Liggett has failed to establish that the primary reason for creation of these documents was to assist in on-going or anticipated litiga-

---

6. Liggett does not assert the work-product privilege for document No. 17.

7. Federal Rule of Civil Procedure 26(b)(3) provides:

a party may obtain documents ... prepared in anticipation of litigation ... only upon a show-

ing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Fed.R.Civ.P. 26(b)(3).

tion. *See e.g.*, Document 102 at RC–6033472 and Document 33 at RC–603346 and 603347. Special accounts, maintained by Jacob & Medinger, outside counsel to CTR and to R.J. Reynolds Tobacco Co., "funded research by expert witnesses in preparation for testimony directly related to a particular case, preparation of testimony for congressional or other hearings, and other research deemed useful by the lawyers." Lisa Bero, et al., "Lawyer Control of the Tobacco Industry's External Research Program", *Journal of the American Medical Association* Vol. 274, No. 3, 241, 242 (1995) (hereinafter cited to as "Lawyer Control"). This is confirmed by the documents. *See* Document Nos. 33 and 112. Counsel for Liggett at oral argument confirmed that "special account 4 was an account of certain lawyers and it was used in connection with the preparation of defense on product liability cases." This explains why the Special Projects research documents are devoid of references to litigation strategies or other "thought processes" otherwise associated with litigation. *In–Store Advertising, Securities Litigation, supra*, 163 F.R.D. at 456.

Moreover, Liggett asserts that any Special Projects research scientist was free to publish its findings and opinions without restrictions. It would appear that this was encouraged, which is fully consistent with the public relations motivation behind Special Projects. This is hardly the type of agreement that one would find, however, where counsel engages a scientific or medical expert for the purpose of testifying in litigation. In litigation, counsel tightly controls the availability of the expert report, and the materials relied on by the expert and disclosure is customarily made during the last phase of discovery and then under counsel's control. *See* Rule 26(c) Fed.R.Civ.P.; and the Civil Justice Expense and Delay Reduction Plan (E.D.N.Y.) § II(B).

The work product privilege is not applicable.

### E. *Crime–Fraud Exception to the Attorney–Client Privilege*

■■■ The crime-fraud exception applies "to communications made in further-

ance of fraudulent or other unlawful acts." *Matter of Associated Homeowners & Businessmen's Organization, Inc.*, 87 Misc.2d 67, 385 N.Y.S.2d 449, 450 (N.Y.Sup.1976). The proponent of the crime-fraud exception must establish: (1) probable cause to believe that a crime or fraud has been attempted or committed; and (2) probable cause to believe that the communications were in furtherance thereof. *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989); *see also In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir.1984). The party seeking disclosure must show that "a prudent person [has] a reasonable basis to suspect a perpetration or attempted perpetration of a crime or fraud and that the communications were in furtherance thereof." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039. The crime-fraud exception also applies to "intentional torts moored in fraud." *Cooksey v. Hilton Intern. Co.*, 863 F.Supp. 150, 151 (S.D.N.Y. 1994). It does not require proof of the commission of an actual fraud. *Cooksey v. Hilton Intern. Co., supra*, 863 F.Supp. at 151.

■■■ The crime-fraud exception also applies to communications which are claimed to be privileged under the work-product doctrine. *Matter of Grand Jury Subpoenas served upon Doe*, 142 Misc.2d 229, 536 N.Y.S.2d 926, 927–28 (N.Y.Sup.1988) (citing *In re John Doe Corp.*, 675 F.2d 482 (2d Cir.1982); *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982)).

■■■ Liggett asserts that the Sackmans have not met their evidentiary burden to establish "probable cause to believe" the existence of fraud. In *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Supreme Court held that once the court has found that the party challenging the applicability of the attorney-client privilege has made the threshold showing [8] required to warrant *in camera* review, the

---

**8.** *Zolin* held that this was evidence sufficient to support "a reasonable belief that *in camera* inspection may yield evidence that establishes the exception's applicability." 491 U.S. at 574–575, 109 S.Ct. at 2632.

court may proceed in determining whether or not the exception applies. The court has previously found that the Sackmans met the threshold requirement for *in camera* inspection. *See* Order dated October 20, 1995. The proponent does not have to establish probable cause of fraud through independent evidence but rather, the court may make such determination based on the *in camera* review of documents. *Id.* at 555, 109 S.Ct. at 2622.

The Sackmans' papers, together with the documents, provide the court with *prima facie* evidence sufficient to establish probable cause (1) that a fraudulent purpose existed in Liggett's use of CTR Special Projects, and (2) that the documents at issue furthered the fraud. The "Organization and Policy" of the TIRC states that the "object of its research program is to encourage scientific study of facts about tobacco use and health ... for a full evaluation of all factors being studied in connection with these diseases." [9] This is consistent with the formation of a non-profit scientific research entity formed under the laws of the State of New York. A document entitled "A Frank Statement to the Public by the Makers of Cigarettes" ("Frank Statement"), identifies the reasons for the creation of TIRC, CTR's predecessor. That statement asserts that TIRC's purpose was to undertake scientific research in order to independently ascertain whether tobacco products were injurious to public health. The record establishes that CTR Special Projects was used instead as a vehicle to promote scientific research which would support the economic interests of the tobacco industry.[10] TIRC, and CTR, its successor, along with the tobacco companies and their counsel, were willing and knowing participants in this scheme to mislead the public. *See e.g.*, Declaration of Dr. Richard Pollay, annexed to plaintiffs' letter dated November 21, 1995 at Exhibit D para. 8; and Document Nos. 17, 33 and 112.

The CTR, as discussed *supra*, had two methods of funding research: through SAB, and through Special Projects. The SAB was comprised of independent and unbiased scientists that would approve research funding for "grant in aid" projects. The CTR Special Projects, however, by-passed the independent board of unbiased scientists and funded projects to further the economic interest of CTR members as recommended and approved by the tobacco company executives and their lawyers.

CTR did not inform the public of the difference between Special Projects and its SAB approved grant-in-aid program in releasing Special Project reports. For example, acknowledgments in the articles submitted by Liggett as Documents "C", "D" and "E" merely state that the article was "supported in part by Special Project Grant No. ... from the Council of Tobacco Research (CTR)—U.S.A. Inc., New York, New York" or "[t]he studies have been supported by a Special Project grant from the Council for Tobacco Research—U.S.A., Inc.".

The documents confirm that attorneys for the tobacco companies met, discussed, and decided whether or not a specific project warranted funding. Liggett implicitly acknowledges that the projects were not undertaken for the purpose of producing unbiased reports simply by invocation of the work product privilege. These documents furthered the fraud that CTR Special Projects perpetrated on the public. CTR released the lawyer-picked research projects results under the guise of unbiased scientific findings.

Lastly, Liggett claims that the documents reviewed *in camera* do not have anything to do with the allegations in the complaint, and for that reason are not subject to the crime-fraud exception. The Sackmans have alleged that a continuing fraud exists, and have pleaded the facts as best they could, without access to the documents. This is adequate,

---

9. *See* Exhibit "D" to the *Letter,* dated November 21, 1995 by plaintiffs' counsel, Kenneth B. McClain.

10. Liggett tries to rebut this allegation by stating that it "did not participate in the creation or distribution of the 'Frank Statement' ". *Letter of*

*James V. Kearney,* dated November 29, 1995 at 3. However, at oral argument Liggett conceded that CTR was the successor to TIRC, and that at no time during Liggett's membership did CTR disclaim the purposes and objectives of the organization as articulated in the Frank Statement.

given the unavailability of the documents when the complaint was filed.

Based on the foregoing, the court concludes that the Sackmans have sustained their burden of establishing probable cause that a fraudulent scheme existed and that the documents herein are in furtherance[11] of that fraud.

Accordingly, even if the privileges asserted here by Liggett were applicable, the court finds that the crime-fraud exception applies and mandates disclosure.

*Conclusion*

The court's review of the parties' submissions and of the documents at issue reveals that Liggett has failed to establish that the attorney-client, joint defense, or work-product privilege is applicable to these documents. The court further finds that due to the critical public health issues at stake, there are compelling public policy interests which preclude application of any of the privileges invoked by the defendant herein. Moreover, the Sackmans have demonstrated *prima facie* evidence of the existence of a fraud, and that Special Projects portions of each of the communications contained in the documents submitted for *in camera* review was in furtherance of that fraud. Accordingly, Liggett is ordered to turn over Special Projects portions[12] of the documents produced for *in camera* inspection.

SO ORDERED.

### APPENDIX B—REDACTION

This index identifies those portions of the documents which do not relate to CTR Special Projects and should be redacted prior to production.

Document # 1: redact paragraphs numbered 1, 5, 6, 7 and 8.

Document # 2: redact beginning on page 2, paragraph entitled "National Association of Broadcasters", through to the top of page 3, first full paragraph ending with "promotional purposes".

Document # 4: redact paragraphs numbered 5, 6 and 7.

Document # 7: redact paragraph numbered 6.

Document # 19: redact all material through paragraph "6" at page RC–6033323, redact all material at RC–603324 starting with the paragraph "Mr. Galloway then. . . ."

Document # 33 redact at RC–6033347 entire paragraph which starts "Unfortunately. . . ."

Document # 36: redact from "Mass . . ." through to "went to see . . ." at RC–6033352.

Document # 51: redact material contained under the headings "National Resources . . ." at RC–603374–75; redact at RC–6033376 all except heading "Harvard Project" and materials therein; redact all materials at RC–6033377; redact all materials at RC–6033378 through RC–6033381.

Document # 52: redact material contained after listing the attendees at RC–6033382, up to ". . . Machine" at RC–603383; and redact all materials at RC–6033384 up to "Harvard Project"; and redact all materials at RC–6033385 ending at ". . . CTR."

Document # 102: redact all paragraphs following the fifth line of the body of the letter at RC–6033468; redact entire page at RC–603369; redact at RC–6033475 all material under "3" and "4" ending at RC–6033476; redact all materials at RC–6033477 after the fourth line.

Document # 109: redact all paragraphs except "8" at RC–6033450.

Document # 110: redact all materials under the heading "IV–10" at RC–6033491.

Document # 113: redact material (except "Public Relations" and material thereunder) contained under the headings labeled I, II, III at RC–6033526–RC–6033531; redact at RC–6033532 commencing seven lines from the bottom at RC–6033532; redact RC–6033533; redact all to end of document except materials under 2 at RC–6033535.

11. *See* annexed appendix at "A," which is ordered to be sealed pending any appeal of this order.

12. *See* descriptions of redacted portions, annexed at appendix at "B."

Document #114: redact material commencing five lines from the bottom at RC–6033537 though eight lines at the top of RC–6033538; redact beginning at seven lines down at RC–6033540 through six lines down at RC–6033541; and redact all of RC–6033542.

Document #115: redact material beginning eight lines from the top at RC–6033547 through the end of RC–6033548; redact all materials in the last four lines at RC–6033549.

Document #116: redact material beginning nine lines from the bottom at RC–6033550 through the remainder of the document.

Document #117: redact all material except last nine lines at RC–6033558; and redact the last eight lines at RC–6033561.

Document #118: redact last five lines at RC–6033562 through RC–6033566, except lines five through twelve; redact all of RC–6033567.

Document #119: redact material starting paragraph numbered 2 at RC–6033570 through RC–6033572; redact first four lines at RC–6033573; and redact material contained under paragraphs numbered 6, 7, 9, 10, 11, 12 and 13A up to five lines from the bottom at RC–6033577, and redact RC–6033578.

Document #120: redact all material contained in "Agenda #6" and "Agenda #5" at RC–6033581.

Document #121: redact all material at RC–6033584 except lines four and five from the bottom; at RC–6033585 redact all except lines two to fourteen; at RC–6033586 redact all except the last nine lines.

Document #122: redact all except material contained under paragraph labeled 8 at RC–6033593.

Document #123: redact all material, except last four lines at RC–6033597.